Harold Baer, J.
This is a motion, brought on by order to show cause, for a preliminary injunction. The order of March 18, 1977 included a temporary restraining order pending the hearing. The order stayed the New York Jets Football Club, Inc. (Jets), and its acting president, Leon Hess, from breaching its lease agreement with the City of New York (City) by scheduling home football games at a place other than Shea Stadium. It stayed the New Jersey Sports and Exposition Authority (Authority) and its chairman, David Werblin, from inducing a breach of the Jets’ contract with the City by arranging a lease whereby the Jets would play some home games in their facility (Meadowlands) in New Jersey. It enjoined the National Football League (NFL) and its commissioner, Pete Rozelle, from scheduling any Jets home games during the baseball season so as to violate the Jets-City lease agreement.
Shea Stadium, built by the City, was leased to the Metropolitan Baseball Club, Inc. (Mets), by agreement dated October 6, 1961. Later, on September 10, 1964, a lease agreement was entered into between the City and Gotham Football Club, Inc., predecessor of the Jets. No preliminary relief was requested in the original motion by the City against the Mets and its chairman, M. Donald Grant. However, a later motion, by order to show cause, requested that they be stayed from *313 failing to perform the agreement with the City. The Jets cross-moved for partial summary judgment. The Authority and Werblin cross-moved to dismiss the complaint on jurisdictional as well as on substantive grounds. The NFL and Rozelle likewise cross-moved for dismissal of the complaint on jurisdictional as well as on substantive grounds.
The first issue to be argued before this court was the status of the preliminary restraining order of March 18, 1977 which defendants insist expired and the City contends remained in full force and effect until hearing before this court on April 28. At that time this court continued the stay until determination of the present proceeding. On March 24, 1977 the defendants NFL and Rozelle filed a petition to remove the case to the United States District Court for the Southern District of New York. Defendants argue that at that point the case was removed to Federal jurisdiction and thereafter the Federal rules applied, citing section 1450 of title 28 of the United States Code. Under those rules (Fed Rules Civ Pro, § 65, subd [b]) a temporary restraining order must by its own terms expire at the end of 10 days unless renewed or extension is consented to. Therefore it is submitted the restraining order expired on April 4, 1977. This, even though the code provides that injunction orders and other proceedings had prior to removal remain in full force and effect (US Code, tit 28, § 1450). In addition, the City moved for an extension of the stay before United States District Judge Edelstein. He had authority to modify, extend or dissolve the stay. He did not do any of these. The parties entered into a stipulation to maintain the status quo until April 15, 1977, and on April 14, 1977 Judge Edelstein filed his decision. Pertinent is the end of the decision: "The city’s motion for an order remanding this case to the state court is granted. Having determined that this law suit is not within its jurisdiction, the court does not reach the city’s application to extend the temporary restraining order”.
The District Court did not modify or dissolve this court’s stay. The case was remanded with the stay in full force and effect. To hold otherwise would be ludicrous. It would mean that a defendant could unilaterally void a State court order and, by merely filing a petition, oust the State court of jurisdiction. The statute does not so provide. Rather, until removal is finally determined, the State court’s jurisdiction is not terminated but held in abeyance by the statute’s direction that the State court refrain from action (US Code, tit 28, *314 § 1446, subd [e]). The cases uniformly hold that upon remand, the action resumes its position "as though no removal had ever been attempted” Railroad Co. v Koontz, 104 US 5, 16; Leslie v Floyd Gas Co., 11 F Supp 401; Doerr v Warner, 247 Minn 98, 106). The Supreme Court has recognized this basic rule even to the extent of finding valid after remand a default judgment entered by the State court after the filing of the petition for removal (Roberts v Chicago, St. Paul & Minneapolis Omaha Ry. Co., 48 Minn 521, affd 164 US 703). As characterized by the Supreme Court in the Railroad Co. case,(supra) the filing of the petition is merely an "attempt” to transfer jurisdiction. A defendant’s unilateral action does not accomplish that transfer. Therefore, the restraining order of March 18 remained in effect until this decision.
This court was assured at argument that if the order is in effect there has been no violation by the NFL. This is hardly the case. Football schedules were issued by NFL in the period between the date it filed its petition for removal to the Federal court and the date of remand. While the court has not been asked to find the defendants in contempt, and will not do so sua sponte, it can and does rule that the NFL schedule, insofar as it purports to schedule games for the Jets is null and void since issued in violation of this court’s order.
The cross motion by Werblin and the Authority to dismiss for lack of jurisdiction is granted. Tort long-arm jurisdiction (CPLR 302, subd [a], par 3) on which the City has relied is not effective. For jurisdiction to be acquired injury must have occurred. While the complaint describes the threat of injury in this State, there is neither allegation in the complaint, nor factual showing on the motion that any injury has occurred in New York.
One further jurisdictional objection raised by NFL and Rozelle is that they were improperly served; that NFL is not a corporation but an unincorporated association. This is an irregularity curable by amendment (CPLR 2001). Here, service was made upon defendant Rozelle pursuant to CPLR 308 (subd [2]) and upon NFL at its office. Rozelle is the commissioner and chief executive officer, there is no president. (General Associations Law, § 13; see by-laws of NFL §§ 7.1 [a], 8.4 [B].)
The Jets oppose the City’s motion for a preliminary injunction on several grounds. They contend that no preliminary relief is warranted because the City has failed to establish irreparable injury or a meritorious action with likelihood of *315 ultimate success. The Jets contend that a balancing of the equities would favor them. They claim that the agreement between the parties permits home games scheduled within the baseball occupancy period to be played elsewhere when there is a conflict agreement (§ 4.2).
The Jet-City lease agreement requires that home games after September 1 of each year be played in Shea Stadium (Agreement, §§ 4.7, 38.1 [b]). This requirement was a vital part of the consideration for the agreement. The City built the stadium at great cost. It required State legislation to construct the stadium (L 1961, ch 729; Administrative Code of City of New York, § 532-15.0) and Board of Estimate approval of the lease agreements with the Mets and the Jets. The public interest and purpose of the stadium construction is detailed in the statute. The latter part is quoted: "It is hereby declared that all of the purposes referred to in this sub-division b are for the benefit of the people of the city and for the improvement of their health, welfare, recreation and prosperity, for the promotion of competitive sports for youth and the prevention of juvenile delinquency, and for the improvement of trade and commerce, and are hereby declared to be public purposes.”
The City was not authorized to construct the stadium for the lease money consideration. The City, as a corporate body, has not, will not, or was it intended to make a profit from stadium rental. It is the City as a community, "the people of the City” to quote the statute (L 1961, ch 729, § 1), who are here threatened with irreparable injury. The purpose of the construction and the leases, and the requirement that home games, both baseball and football, be played at Shea, are inextricably entwined with the vital public interest as quoted above from the enabling legislation. Every home game not played at Shea causes more than a loss of rental. That is only money. It results in injury to the welfare, recreation, prestige, prosperity and trade and commerce of the people of the City.
The Jets argue that "It’s only two games. No big deal”. Every business that leaves the City; every major corporate home office that departs for the suburbs; every drop in the number of people employed reported by the Bureau of Labor Statistics; every downward thrust in the City’s credit standing; each team that leaves for a greener (larger) stadium is another drop of the City’s life blood. Every reduction in the number of home games seriously adds to the cumulative effect *316 upon the City’s viability. Two games may sound small but they are an important part of the home game schedule. Such injuries are not measurable in money damages nor could money repair the harm. (Barnum v Rome, 61 NYS2d 426, affd 270 App Div 853; 43 CJS, Injunction, § 23, p 447). The threat of irreparable injury has not merely been shown, it is self-evident.
Further, the lease agreement grants the City the right to injunctive relief against a threatened breach (§ 27.7 [a]). The Jets argue that the provision is mere "boilerplate”, found in most leases and never enforced. The cases cited by defendants involving department stores and supermarkets as well as the personal service cases cited by the City are inapposite. Money damages may compensate a developer or manufacturer but money cannot compensate the people of this City for immeasurable, indirect and intangible damages.
The Jets have moved for what they call "partial” summary judgment. They assert that they are entitled to play home games away from Shea Stadium because of the Mets baseball schedule and request the court to so rule. In making the motion they go directly to the only vital issue between the Jets and the City. They recognize that issue is one of law, not of fact. They label their motion "partial” because they present it only in the context of the two games for this year scheduled in violation of the stay. In truth, the issue is not "partial” at all. Determination of the Jets’ right to play those two games away from Shea requires interpretation of the Jets-City lease agreement and will fix their rights — and their obligations — for the balance of the lease as well. If they are correct in their contention that they may play those two games away from Shea not only will the temporary stay be terminated, this action will also be terminated. If they are wrong in their contention, the action will also be terminated. Since the only other issue, irreparable injury, has been determined as between the Jets and the City there are no issues to be resolved by trial between them.
The Jets’ lease. In section 38.1(b) the Jets agree that they will "not do or suffer to be done anything * * * to permit [them] to play home games in any such other city or location”. There are exceptions to the home game requirement, specifically sections 4.2 and 4.7 to accommodate the prior lessee, the Mets, so as not to interfere with the baseball season. The Jets and the NFL were cognizant of the baseball schedule. For *317 nine years and for four earlier years by the Jets’ predecessors, schedules were promulgated so as not to interfere with the Mets’ schedule. To schedule a game in direct conflict with the known baseball schedule does not permit the Jets to take advantage of sections 4.2 or 4.7, rather it is a breach of the agreement.
The Jets entered into this lease with full knowledge of, and subject to the Mets’ lease. Section 1.1 (a) requires that the Jets’ lease "harmonize” with the Mets’ lease; that to the extent necessary the Jets’ lease "shall be deemed revised, rewritten or excised” to accomplish that result. Section 1.1 (c) provides that any omission in the Jets’ lease required to be made by the Mets’ lease "shall be deemed to have been made”. Lest there be any misunderstanding, two copies of the Mets’ lease were initialed by the City and the Jets and incorporated, not merely by reference, but physically, in the Jets’ lease.
The Mets’ lease. The Mets are granted the priority right to play home games at Shea during the "baseball occupancy period”, a time span which extends from seven days before the baseball season opens to the date of the last scheduled home game. During that period the City may authorize other uses of Shea — such as Jets home games — during Met road trips defined in the agreement as the period from a first away game to four days before the next scheduled home game. The lease, however, has a contingent definition: until the Mets are mathematically eliminated each year the "baseball occupancy period” is defined as ending "20 days after the end of the regular baseball season”. The lease quite obviously attempts to reserve for the Mets the dates needed for playoff and World Series games. Whether it has done this with full effectiveness may be questioned but is not pertinent to determination of the Jets’ motion for summary judgment and the City’s motion against the Jets and the NFL.
After 13 years of scheduling home games to accommodate to the provisions of the Mets’ lease, the Jéts and the NFL, now schedule two home games, one patently impossible to be played at Shea because of a scheduled Met game (Sept. 25, 1977) and the other (Oct. 2, 1977) on a day, which rightly or wrongly, the Mets claim is a reserved day. In addition, the interpretation of the Jets’ lease is aided by the constitution and by-laws of the National Football League. That 90-page document is replete with professional football’s recognition of *318 the need to schedule early season games around the late season baseball games to accommodate the 15 football teams that share stadia with baseball teams. Even the realignment of teams within the two football conferences is required to take into consideration "baseball conflicts involving clubs playing home games in baseball stadiums [sic]”. (§ 4.4 [h]).
The Jets insist, however, that sections 4.2 and 4.7 justify their playing a home game away from Shea on September 25. When the specific language of section 4.2 is examined, the Jets’ reliance on it must be recognized as misplaced. The section is not an avoidance of section 38.1 (b). It does not permit the Jets to effect advance scheduling of home games outside of Shea. It permits the City to cancel an already scheduled Jets’ game. Similarly, section 4.7 read without reference to the rest of the lease, or to the Mets’ lease, seems to excuse performance. However, neigher of these sections are to be read in a vacuum. They must be read in the context of sections 1.1 and 38.1 (b) of the Jets’ lease. They must be read in the context that both parties, when executing the lease, knew that when the football schedule is released in the spring of each year, the possibility always exists of the baseball teams requiring home dates in addition to the scheduled games, for playoff or World Series games. The Mets’ lease anticipated that possibility, the NFL’s constitution and bylaws anticipated that possibility and sections 4.2 and 4.7 of the Jets’ lease anticipated it. When read to "harmonize” with the Mets’ lease (§1.1) and to afford the City its rights under section 38.1 (b), it is evident that these sections are escapes for scheduling impossibilities, not excuses to leave for a larger stadium.
The performance required of the Jets under section 38.1 (b) is not impossible so as to call into play either sections 4.2 or 4.7. A contractor is excused from performance when performance is impossible. That rule does not apply when performance is rendered impossible by the contractor’s own act or failure to act, or the actions or failure of those bound to him. (6 Williston, Contracts [rev ed], § 1959; Canadian Ind. Alcohol Co. v Dunbar Molasses Co., 258 NY 194, 198). Clearly under all the provisions of the Jets’ lease, "harmonized” with the Mets’ lease, the Jets and the NFL as will be shown, are required to schedule home games around the Mets instead of deliberately creating a conflict. It is their own act that is causing impossibility. The Jets’ desire to play early season *319 home games is understandable (even though manifested so threateningly for the first time only when a larger stadium is available), but that desire is not a substitute for actual impossibility which may excuse performance.
It may not be contended that an outside force, the NFL, makes performance excusably impossible. The NFL is not a stranger to the Jets lease. The lease had long been in existence when the Jets joined the league. The lease was, and is, a public document. Even if it were not, the Mets use of Shea was open and notorious and the NFL had experience with shared stadia. The league knew or should have known that the Jets could not have free and totally unencumbered use of Shea. Even if it did not examine the lease, it accepted the Jets into the league subject to that existing lease. Moreover, contracts such as that between the Jets and the league or the television contracts cannot serve as the basis of an excuse of impossibility of performance. The Jets must take the risk of conflict between them and the pre-existing Jets’ lease agreement (Canadian Ind. Alcohol Co. v Dunbar Molasses Co. supra).
The Jets’ motion must be denied. As stated earlier there are no factual issues remaining. Summary judgment will be granted against the Jets and the NFL. Jets home games may be scheduled only on dates which "harmonize” with the Mets’ schedule.
Irreparable injury and the threatened breach have been established. In fashioning its remedy a court of equity must weigh the effect on the parties. Enforcement of a contract which results in minimal benefit to one party while causing great harm to another cannot be countenanced in equity. In balancing the equities among the parties involved, it should be noted that the Mets hold a prior lease; that the Jets and their predecessor were fully aware of the terms of the Mets’ lease, in particular the definitions and article V; that the Jets or their predecessor entered into their lease agreement with the City fully aware of those terms (see §1.1 of Jets-City Agreement); they were in no way coerced. The Jets and the NFL adhered to the terms of the agreement for nine years and now for the first time set a home game on a scheduled baseball date during the baseball occupancy period. The Jets and the NFL have violated a restraining order. The Jets have available other early season home dates at Shea. Monday night, September 26, October 2, October 9 and October 16 are all *320 available to satisfy that desire. The court notes that only half the teams can ever open at home and only half the teams can ever play two or more of their first four games at home. Even with this year’s Mets’ schedule the Jets and the NFL could have scheduled as many as three of the first four Jets’ games at home. The court notes, too, that elsewhere in the league the football schedule is set with knowledge of the potential for conflict with playoff and World Series games. Equity and good faith must be coexistent. Not only did the Jets and the NFL set conflict dates for the regular season games, they did the same for the two Jet exhibition home games. Both August 5 and August 20 are scheduled Met home dates. These were scheduled despite the fact that under the leases at least four other open dates are available. Although the City concedes that preseason home games, under the lease, may be played away from Shea, one must wonder whether the 20,000 additional seats at the Meadowlands had anything to do with the dates chosen. When all of the foregoing, in particular the alternatives available to the Jets, are balanced against the nature of the injury to the City, the equities need be weighed no further. Injunctive relief is appropriate.
However, this court is aware of the desire of the Jets to play some of their early games at home. It is also aware of the preferential lease agreement held by the Mets. Accommodation can and should be made so that early games can be played at home by the Jets. This is for the future. At this time nevertheless the Jets can play some of their early games at the stadium. The Mets’ last scheduled home game in 1977 falls on Sunday, September 25, 1977. They then leave on a road trip, ending the season on the road on October 2, 1977. They will not need use for the stadium except in the unlikely event of leading the eastern division of the National League. Even if that should occur, they would not be scheduled to play at Shea until October 7, 1977 (more than four days after October 2). They cannot shift their last home game from September 25. The Jets may utilize the stadium facilities, and the stadium can be made ready for football on Monday night, September 26, 1977, Sunday, October 2, 1977, Sunday, October 9, 1977 and each Sunday thereafter during the football season.
The City’s motion against the Mets is premature and too nebulous. It must be denied. However, having searched the record as required by the Jets’ motion, the court has found *321 that if not all, at least many of the interpretations sought by the City’s request for a declaration of rights against the Mets are ripe for summary judgment (CPLR 3212, subds [b], [g]). For example, in implementing the Jets’ lease the definition of "playoff game” under the Mets lease is crucial. The Mets have claimed that the game they would play at Shea on October 7, if they win in their division, would be a "playoff” game under their lease. Since that game is not played "to break a tie”, and since baseball’s postseason playoffs have been changed since the Met lease was executed, the claim needs a judicial declaration. Part of the conflict between the two teams is caused by the time needed to repair the grass of the playing field, especially after a heavy rain. The burden of that conflict could be eased for the Jets if the City has the right under the Mets’ lease to install artificial turf. These and other issues require no trial. They involve only contract interpretation. The court directs the City to submit its position and papers on these and such other contract interpretation issues as it deems appropriate by serving and filing its papers on or before 1 p.m. on May 20, 1977; the Mets by May 27, 1977 by 1 p.m. Rebuttal by both may be served no later than 1 p.m. on June 3, 1977. Because of their obvious interest in the interpretation of the Met lease, the Jets, the NFL and the Commissioner of Baseball may submit, if so advised, briefs as amicus curiae. Copies of all papers will be served on and by the amicus curiae who serve notice of appearance on the Mets and the City’s attorneys.
In lieu of further proceedings the court suggests a meeting of all parties with the court prior to May 20, 1977 so as to avoid further litigation. The purpose of the meeting would be to attempt to harmonize the requirements of all parties and to formulate feasible joint use of the stadium. Such meeting may be held on May 17, 1977 at 2 p.m. if all parties agree and so inform the court.
At this time, judgment may be settled for injunctive relief as demanded against the Jets and NFL in accordance with this decision. Also, an order shall be settled dismissing the complaint against the Authority and Werblin and severing the action and the remaining motion against the Mets.