OPINION OF THE COURT
Richard S. Lane, J.
On or about November 10,1982 the New York Yankees told the city by telephone that the 1983 home opening series with the Detroit Tigers scheduled for the stadium on April 11, 12 and 13 would be played in Denver. A day earlier renewal applications had been sent to box holders for a curtailed home schedule starting April 15.
The city promptly commenced an action seeking declaratory and injunctive relief, and moves herein for a preliminary injunction enjoining execution or implementation of any agreement with Denver pending trial.
The Yankees answered asserting failure to state a cause of action, waiver, estoppel and laches, and resist the motion for a preliminary injunction on the basis of communications between the parties hereinafter described.
*333 With the season only a few months off the motion may be the whole ball game.
Sometime after the extensive renovations to the stadium undertaken by the city as the cornerstone of the 1972 lease with the Yankees, it was discovered there were certain structural flaws in the stands in lines abutting on left field and right field. Temporary repairs were made for several years; permanent repairs were scheduled to be made between the close of the 1982 season and the opening of the 1983 season; and plans and specifications were drafted, all with the participation and approval of the Yankees.
Came July 30, 1982 and the Deputy Commissioner of Parks wrote to the Yankees expressing confidence that the goal of completion prior to the beginning of the 1983 season could be achieved, but also expressing a caveat as follows:
“However, in view of the magnitude of the project and the small time frame we would consider it prudent to establish a contingency schedule for Yankee games to be played at the Stadium during the early part of the season. While we will attempt to provide for contingencies in the contract itself, since a large part of the work will be accomplished in the winter it is conceivable that inclement weather and other unforeseeables may negatively affect our schedule.
“We would appreciate any thoughts and assistance you can give us in this connection. If you have any questions, please don’t hesitate to call me.”
The city contends, and the Yankees on argument concede, that there had been ongoing discussions between the parties about problems created by the proposed construction work, and that this letter was written at the request of the Yankees as the basis for consultation with the Tigers and with the American League.
The summer passed without any response from the Yankees to this July 30 letter. Meanwhile the plans and specifications were put out for bid, and a contract was let calling for completion by February 28. The contract included unusual provisions for overtime and enclosing the affected areas to protect against any interruption of the work as a result of adverse weather. In addition it was now *334 understood with the contractor, as apparently it was not in the earlier discussions between the parties, that the playing field itself would not be affected in any way, thus saving about five weeks. The Yankees were fully briefed on this progress in early September.
Came October 8,1982 and the Yankees at last replied to the July 30 letter requesting a guarantee of completion in a timely manner and an indemnification against any loss of revenue if the stadium should not be available for opening day. The city’s initial reaction was affirmative. However, on October 12 while the city’s formal answer was allegedly awaiting the approval of the Corporation Counsel, the Yankees spelled out that the guarantee would have to extend to no debris or litter in view of fans and no seats unavailable on opening day. Scrapping the proposed guarantee and indemnification, if indeed it had ever been drafted, the Commissioner of Parks instead wrote personally to Mr. Steinbrenner on October 19,1982. He adverted to the history of co-operation between them and to all of the efforts being made to assure timely completion, and suggested that, in the worst case, only 1,000 to 2,000 seats would be unavailable for which the Yankees would be compensated by abatement of rent pursuant to the lease.
Again there was no immediate response from the Yankees'. Some three weeks later came the bombshell call about Denver.
There can be no dispute that playing in Denver would violate section 4.7 of the lease requiring all home games to be played in the stadium through the year 2002.
Is such violation justified in any way by the pas de deux between the parties during the summer and early fall?
The first possibility that comes to mind is anticipatory breach by the city. But clearly that possibility has to be rejected (Tenavision, Inc. v Neuman, 45 NY2d 145, 150; Gittlitz v Lewis, 28 Misc 2d 712, mot for resettlement den 29 Misc 2d 134; Doyle Dane Bernbach, Inc. v Avis, 526 F Supp 117; 11 Williston, Contracts [3d ed], § 1300 et seq.; 22 NY Jur 2d, Contracts, § 387 et seq.).
In the first place .nothing in the July 30 letter may be construed as a repudiation of the lease. Implicit and ex *335 plicit therein is the city’s intention and expectation of being able to perform.
In the second place, even if a repudiation might be found lurking in the letter, it certainly does not go to the entire lease. Partial repudiation is not sufficient. A distinction has to be drawn between anticipatory breach and just plain breach. The former entitles the other party to terminate, change position, and/or sue for damages before the time for performance has arrived. The latter merely allows the other party to sue for damages in the event of flawed performance.
In the third place, even if a repudiation might be found lurking in the letter and even if the principle of anticipatory breach might be stretched to encompass partial repudiation, the record establishes a retraction. By the early fall the city is no longer talking about contingent scheduling, but merely of the possibility in the worst case of the unavailability of a couple of thousand seats. The threat to the Yankees’ ability to open on April 11 in the stadium, which may have been real enough in June, is substantially evaporated well before the consummation of negotiations with Denver. The chronology of those negotiations is not revealed in the papers, but the court notes that the Denver Mile High Stadium user contract was not mailed to the Yankees until November 10.
Commendably recognizing the weakness of the anticipatory breach theory, the Yankees place greater reliance on the doctrine of waiver and estoppel. But these are equally tenuous reeds. Since there is no suggestion of any fraud or negligent misrepresentation by the city, true estoppel or “estoppel in pais” is not involved here (21 NY Jur, Estoppel, § 26). As used in defense here estoppel is just another way of saying waiver. It requires a showing that the city had intentionally and overtly abandoned its rights under the section 4.7 of the lease or had agreed to excuse the failure of the Yankees to comply with their obligations thereunder — i.e., to play the first scheduled home series in the stadium (1 Williston, Contracts [3d ed], § 140; 5 Williston, Contracts [3d ed], § 678; 22 NY Jur 2d, Contracts, § 330). No such showing may be found in the letter *336 of July 30, and it is certainly negatived by the city’s subsequent communications and actions.
Nor may the city be charged with laches. It commenced this action within days after learning of the Yankees’ intentions.
Accordingly, the court finds a strong likelihood of eventual success by the city in this action.
The court also finds that the equities weigh on the side of the city. Viewed as objectively as possible it would appear that Mr. Steinbrenner, ignoring the good-faith efforts by the city to satisfy his needs, was grabbing a pretext to take his team to greener pastures — i.e., a larger stadium and a populace with an unfulfilled yearning for major league baseball. Tending to demonstrate that concern about the conditions of the stadium was not his only motivation are the following: (a) He waited passively throughout the entire summer while the risk of nonavailability of the stadium was at its highest; (b) He escalated his demand when it appeared that the city was about to give him the guarantee and indemnification he requested; (c) He chose to negotiate with cities seeking a major league franchise while ignoring the obvious solutions — Shea Stadium or Tiger Stadium in Detroit; and (d) In November looking forward, if the stadium might not be ready on April 11, how could he assume that it would be ready on April 15?
Furthermore, to allow the Yankees to proceed to contract with Denver might open a real Pandora’s box. It would leave the Yankees with conflicting contract obligations. It would invite litigation in Colorado as well as New York with results in doubt throughout the winter not to mention the nightmare of possibly opposite results.
Finally the court easily finds a threat of irreparable injury to the city (City of New York v New York Jets Football Club, 90 Misc 2d 311, 315-316). Much more is at stake than merely the loss of direct and indirect revenue to the city.
The Yankee pinstripes belong to New York like Central Park, like the Statue of Liberty, like the Metropolitan Museum of Art, like the Metropolitan Opera, like the Stock Exchange, like the lights of Broadway, etc. Collectively *337 they are “The Big Apple”. Any loss represents a diminution of thé quality of life here, a blow to the city’s standing at the top, however narcissistic that perception may be.
“Big deal” argue the Yankees. We open in Seattle anyhow on April 5. We will have a New York opening with all the traditional hoopla on April 15. And it’s only three games we are talking about which is proportionately a tnuch smaller percentage of the season than the two games in the Jets case. However it is the symbolism of the act not the quantity which counts. Any reduction in the number of home games, especially if it involves the home opening games eagerly awaited by the real fans after a long winter in the hot stove league, erodes the ties of loyalty between the people of the city and their team. Dare one whisper the dreaded words: “The Denver Yankees”.
No money damages can measure or assuage this kind of harm.
Taking major league baseball on tour, Mr. Steinbrenner, is an idea whose time has not yet come. Perhaps it will come in due course. As the New York Times editorialized recently: “And however the Court rules in this case, fans accustomed to seeing players shift venue every season, had better get ready for the day when the whole team calls the whole country home.” But if and when it does come, it should be institutionalized by the league so that no home stadium contracts are violated.
The motion for a preliminary injunction is granted.