**HAMILTON WEST DEVELOPMENT, LTD., Plaintiff,**

**v.**

**HILLS STORES COMPANY, Defendant.**

**No. 1:97–CV–261.**

United States District Court, N.D. Ohio, Eastern Division.

March 1, 1997.

Sheldon Berns, Benjamin J. Ockner, Kahn, Kleinman, Yanowitz & Arnson, Cleveland, OH, for plaintiff.

Roy Allan Hulme, Reminger & Reminger, Cleveland, OH, for defendant.

## OPINION AND ORDER

O'MALLEY, District Judge.

Plaintiff, Hamilton West Development, Ltd. ("Hamilton") seeks judgment from this Court permanently enjoining Hills Stores Company ("Hills") from vacating, or ceasing operation at, a leased premises in the Hamilton West Shopping Center in Hamilton, Ohio. Hamilton asks that Hills be ordered to continue operating a department store at the Hamilton West location until January 31, 2011, approximately twenty (20) years after commencement of the rental period, as that period is defined in a lease for the premises executed on December 11, 1989 ("the Lease"). Hamilton claims the order it seeks is appropriate because Hills' stated intention to vacate the Hamilton West premises on or before March 31, 1997 is in violation of an express obligation to continuously and actively operate a department store on the premises for the entire term of the Lease.

For the reasons that follow, this Court concludes: (1) that the Lease term upon which Hamilton premises its request for a permanent injunction is not an express "continuous operation" clause; (2) that, under the facts and circumstances presented, it would be inappropriate to conclude that the Lease contains an implied obligation of continuous operation; and (3) that judgment is therefore appropriate in favor of Hills and against Hamilton on the request for specific performance in Hamilton's complaint.[1]

### I. *The Lease*

Hamilton, as lessor, entered into the Lease with Hills, as lessee, on December 11, 1989. The Lease is for use of a ground floor storeroom of approximately 82,856 square feet in the Hamilton West Shopping Center. The Lease term is twenty (20) years.[2] Hills is a discount department store and is the sole anchor tenant in the Hamilton West Center. Hills occupies approximately 45% of the total square footage of the shopping center.

The next largest tenant in the shopping center occupies about 15,000 square feet of space. This tenant, along with one other, have "co-tenancy" clauses in their leases with Hamilton, giving them the option to terminate if the anchor tenant ceases operations and remains closed for one year or more.

Article XLV of the Lease, captioned *"Tenant's Use and Business Hours,"* provides as follows:

Tenant agrees to use the Demised Premises as a department store or a supermarket (and for no other purpose) and to operate its business in the Demised Premises under the name of Hills or such other name adopted by Tenant for its self-service department stores in the Cincinnati, Ohio media market, on all regular business day except legal holidays, at least eight (8) hours each days between 9:00 AM and 10:00 PM. Tenant retains the right, in its discretion, to be open for business on Sundays or holidays for a period equivalent to or less than those during which it is open on regular business days. Except for reasons beyond Tenant's control, including but not limited to the causes listed in Article XXXVIII, or an assignment in accordance with Article XX, should Tenant at any time elect to discontinue the operation of its store, Landlord shall have the option, to be exercised by notice in writing given to Tenant within one hundred eighty (180) days after the date of said discontinuance by Tenant, to cancel and terminate this Lease. If Landlord exercises its said option, this Lease shall cancel and terminate one the last day of the month in which

1. The request for specific performance is contained in Count I of Hamilton's Complaint, filed on January 29, 1997. Count II of that Complaint contains a request for an order preliminarily and permanently enjoining Hills from conducting a "going out of business sale." Because this Court declined to enter a temporary restraining order prohibiting continuation of the "going out of business" sale (which began prior to the filing of the Complaint), the relief sought in Count II is moot. Count II of Hamilton's Complaint is, thus, **DISMISSED.**

2. Actually, the term is twenty (20) years from January 31 of the year following commencement of the rental period. The rental period began, following certain renovations of the premises, sometime in 1990. The Lease term, accordingly, does not expire until January 31, 2011.

Landlord gives such notice, and Tenant shall be released from any further liability under this Lease.

Notwithstanding anything to the contrary contained herein and in further limitation of Tenant's permitted use of the Demised Premises, Tenant shall not use the Demised Premise or any portion thereof for any of the following purposes: (a) sale or exhibition of pornographic materials; (b) a massage parlor; (c) funeral parlor; (d) automobile showroom; (e) body and fender shop; (f) car wash; (g) off-track betting parlor; (h) bowling alley; (i) roller rink; (j) industrial or warehouse purposes; (k) retail drug store business or pharmacy department (except that Tenant may sell merchandise which is also sold in drug stores); (*l*) commercial bank or branch of a commercial bank (savings and loan association or finance company permitted); (m) shoe store (shoe department permitted); (n) electronic game room (sale of electronic games permitted and incidental electronic game machines permitted in store entry vestibule area); (*o*) amusement gallery; (p) non-retail, non-profit or office purposes, except such offices incidental to the operation of Tenant's business therein; or (q) pet shop.

While Article XLV is the primary focus of this dispute, three other articles are relevant to its resolution. They are Article XLVII, captioned *"Joint Preparation"*:

This Agreement is to be deemed to have been prepared jointly by the parties hereto and any uncertainty or ambiguity existing herein, if any, shall not be interpreted against any party, but shall be interpreted according to the application of the rule's of interpretation for arm's length agreements.

Article LII, captioned *"Captions"*:

The captions of the several articles contained herein are for convenience only and do not define, limit, describe or construe the contents of such articles.

and Article LI, which provides that Ohio law governs the "validity, performance and enforcement" of the Lease terms.

## II. *Hill's Decision to Vacate and Hamilton's Response*

The Hamilton West location apparently never proved profitable for Hills. Indeed, Hills was having a problem competing in several geographic areas and decided, sometime prior to January 13, 1997 that it would close its stores at eight separate locations, including the one in the Hamilton West Shopping Center. On January 13, 1997, Hills notified Hamilton of its decision to close its store. On that same date, Hills issued press releases describing its closing of the eight "underperforming" stores by March or April of 1997 and its intention to hold "going out of business sales" at each of the locations in the near future.

On January 14, 1997, Hills confirmed in writing its intention to vacate the West Hamilton location. Specifically, Hills informed Hamilton that it would begin a going out of business sale "within 30 days" and would cease operations completely "60 to 90 days" thereafter.[3]

Hamilton notified Hills shortly thereafter of its objection to Hills' decision to vacate the premises and, on January 29, 1997, instituted this action seeking to prevent Hills from taking any steps to effectuate that decision. Specifically, Hamilton filed a Complaint seeking (1) specific performance of Article XLV of the Lease which Hamilton claims requires Hills to operate a retail business in the leased premises for the entire term of the Lease, and (2) an injunction prohibiting Hills from conducting a "going out of business" sale at the Hamilton West location. Along with the Complaint, Hamilton filed a Motion for a Temporary Restraining Order and Injunction seeking an order restraining Hills from conducting a "going out of business" sale and enjoining Hills from vacating any portion of the premises during the pendency of this proceeding.

On January 31, 1997 this Court heard argument on plaintiff's request for a temporary restraining order. Based on the language of the Lease and the information

---

**3.** Hills has continued to pay rent as specified in the Lease and has indicated its intention to pay rent as and when due under the Lease until Hamilton retakes and relets the premises.

provided by the parties, the Court concluded that (1) plaintiff had not established a substantial likelihood of success on the merits because the language in Article XLV did not unambiguously impose a continuous operation obligation on Hills; (2) the "going out of business" sale plaintiff sought to enjoin had already begun (with attendant advertising), and an order stopping that sale would cause substantial harm to Hills; (3) Hamilton did establish that it would suffer significant harm if it lost Hills, its anchor tenant, from the Hamilton West Center; and (4) Hills, which indicated it did not intend to vacate the leased premises until at least March 30, 1997, would not be harmed if prohibited from taking further steps to wind down its business or vacate the premises pending an evidentiary hearing on Hamilton's request for a preliminary injunction.

Based on these findings, the Court entered an order denying Hamilton's request for an order restraining or unwinding Hills' "going out of business" sale, but granting Hamilton's request that Hills be prohibited from actually vacating the premises, or taking additional steps toward doing so, pending an evidentiary hearing. The evidentiary hearing was scheduled for the morning of February 7, 1997.

Thereafter, the parties jointly moved to postpone the preliminary injunction hearing until at least February 19, 1997, and agreed to abide by the limitations of the Court's January 31, 1997 Order until that date.

On February 19, 1997 the Court conducted an evidentiary hearing, receiving evidence regarding the language of the Lease, the harm Hamilton will suffer if Hills closes its store and the nature of the circumstances surrounding the Lease and the relationship between the parties.[4]

At the conclusion of the hearing, the parties agreed that the evidence presented constituted the totality of the evidence relevant to the substantive dispute between parties— i.e., the meaning and enforceability of Article XLV—and that the parties, thus, wished to submit the matter to the Court on the merits, not merely on the issue of the propriety of preliminary injunctive relief The Court accepted the parties' stipulation and request.[5] This Opinion, and the Order that accompanies it, accordingly, constitutes this Court's judgment on the merits of plaintiff's request for permanent injunctive relief and specific performance of Article XLV of the Lease.

## III. Evidence Submitted As To The Meaning of Article XLV

The parties began negotiations for Hills' use of the Hamilton West premises in mid–1989, after Hamilton was notified that its then-anchor tenant, K–Mart, would be vacating the leased premises and moving to another location. It is undisputed that the lease between K–Mart and Hamilton did not contain a clause requiring continuous use of the premises as a business establishment during the term of the lease. The parties primarily negotiated by telephone (Hills' main office being located in Massachusetts), exchanging letters in June and August, 1989 describing the general terms under which the premises would be leased. Negotiations over the final terms of the Lease occurred in October and November, 1989.

The three individuals primarily responsible for finalizing and approving the Lease terms, Stuart F. Kline (for Hamilton) and Donald Orlando and Joseph E. Andres (both for Hills) testified. None of these individuals testified that they had a specific recollection of the issue of a continuous operation obligation being discussed. Thus, Mr. Kline did not contend that he can recall the issue being proposed by him on behalf of Hills or that he can recall negotiations over language designed to create such an obligation in the

---

4. At the hearing on Hamilton's Motion for a Temporary Restraining Order, the Court concluded that Article XLV of the Lease did not appear to contain an unambiguous continuous operation clause and seemed "at best ambiguous" on the point. As a result, the Court indicated that it would receive extrinsic evidence with respect to the intended meaning of Article XLV.

5. Hills agreed to continue to be bound by the limitations of the Court's earlier order pending issuance of this judgment, or at least until February 28, 1997.

Lease. Similarly, neither Mr. Orlando nor Mr. Andres testified that they have a recollection of the issue being raised by Hamilton and expressly rejected by Hills. Mr. Kline was never asked whether he had a specific recollection of the issue being addressed; when asked, Mr. Orlando and Mr. Andres indicated that they cannot recall negotiations over the issue, and, thus, believe they did not occur.

On behalf of Hamilton, Mr. Kline testified that he believed Article XLV, as drafted, contains a continuous operations obligation and that it would be devastating to Hamilton if it did not. On behalf of Hills, both Mr. Orlando and Mr. Andres testified that they believe Article XLV, as drafted, does not contain a continuous operation obligation. Mr. Orlando further testified that it was not Hills' normal practice to agree to a continuous operation obligation [6] and that, on those occasions when Hills had agreed to such a clause in its leases, Hills always restricted that obligation to a term certain that was of shorter duration than the lease term.

The documents relating to the negotiations for the Lease which were offered contain no reference to a "continuous operation clause" or a "covenant of continuous operation" and do not even generally reference a continuous operation obligation. Neither party produced drafts of the Lease which might reveal the course of changes in, additions to, or deletions from the language in Article XLV. The only documents submitted were:

(1) A June 16, 1989 letter from Mr. Kline to Joseph Segal of Hills (Defendant's Ex. 3) explaining the manner in which Hamilton proposed to calculate Hills' rent for the leased premises. Significantly, the rent calculations for Hills which Hamilton deemed fair were premised upon the net rent then being paid by K–Mart and two other tenants who occupied the remainder of the premises Hills proposed to lease and upon a calculation of the amount Hamilton would need to expend to relocate the two tenants being moved to accommodate Hills' space needs.[7] There is no mention in this letter of a continuous operation obligation;

(2) An August 7, 1989 letter from Mr. Kline to Mr. Segal reciting the "basic business terms" to be incorporated in the Lease (Defendant's Ex. 4) and an August 8, 1989 letter (Defendant's Ex. 5), again from Mr. Kline to Mr. Segal, reiterating the terms set out in Defendant's Exhibit 4 and adding a term regarding the date upon which Hills would open for business in the leased premises. Neither of these documents include, as a referenced "basic business term" or otherwise, discussion of an obligation to continuously operate a business throughout the terms of the Lease;

(3) An October 3, 1989 internal Hills Memorandum from Mr. Andres to Mr. Orlando summarizing "the highlights" of Mr. Andres' October 2, 1989 conversation with counsel for Hamilton (David Eli) during which counsel for Hamilton is said to have "comment[ed] on practically every page" of the Lease. (Defendant's Exhibit 6). The words "continuous operation" do not appear in this document. The final paragraph does indicate, however, that Mr. Eli put Hills on notice of Hamilton's desire to include a "use clause" in the Lease;

(4) Two pages of Mr. Kline's handwritten notes taken during negotiations over the final terms of the Lease on October 12, 1989 (Defendant's Exhibit 7) and November 6, 1989 (Defendant's Exhibit 8). The only pertinent reference in either of these two documents is a small notation on De-

---

6. Mr. Orlando testified it was Hills policy to always "fight" or resist such a clause.

7. This calculation is pertinent for two separate reasons. First, the fact that Hamilton premised the rent to be charged Hills largely upon the rent then being charged tenants that admittedly did not have continuous operation clauses in their leases is telling; if Hamilton were obtaining a promise from Hills to continue to operate in the leased premises for a full twenty (20) years, the value to Hamilton of that promise (and cost to Hills) would presumably have justified a *lower* base rent charge than that being paid by K–Mart, an entity which could vacate the premises at any time with no further cost to itself This calculation is also important because it undercuts Hamilton's claim that the cost of relocating the moving tenants was a cost borne by Hamilton "as an inducement to Hills to enter into the Lease." (Memorandum in Support of Motion for Temporary Restraining Order and Preliminary Injunction at p. 3).

fendant's Exhibit 7 which reads "use clause—dept. store or supermarket."

Both parties also submitted copies of other leases which they contend illuminate the parties' intentions here. Hamilton submitted copies of certain Hills leases with other Ohio landlords which contain clauses using the words "continuous operation." (Plaintiff's Exhibits D, E, F and G).[8] Hills submitted copies of certain Hamilton leases with other lessees containing clauses using the term "continuous operation," or some clear variation thereof (Defendant's Exhibit 2) and certain Hills leases with other lessors containing language Hills concedes imposes an obligation of continuous operation on it. (Defendant's Exhibit 1).[9]

### Law and Analysis

Many courts, in many jurisdictions, have refused to specifically enforce obligations of continuous operation in commercial leases, even where those obligations are unambiguously expressed. See, e.g., The Western & Southern Life Ins. Co. v. Crown Am. Corp. 877 F.Supp. 1041, 1044 (E.D.Ky.1993); CBL & Assoc., Inc. v. McCrory Corp., 761 F.Supp. 807, 809–10 (M.D.Ga.1991); 8600 Associates Ltd. v. Wearguard Corp., 737 F.Supp. 44, 46 (E.D.Mich.1990); M. Leo Storch Ltd. Partnership v. Erol's, Inc., 95 Md.App. 253, 620 A.2d 408, 412 (1993); Lorch, Inc. v. Bessemer Mall Shopping Center, Inc., 294 Ala. 17, 310 So.2d 872, 876 (1975); Madison Plaza Inc. v. Shapira Corp., 180 Ind.App. 141, 387 N.E.2d 483, 486–87 (1979). The theory behind this hard and fast rule is that courts should refuse to order specific performance of contracts where such an order would require continuing court supervision.

While no Ohio court has expressly addressed the issue, this Court if of the view that, if given the opportunity to do so, Ohio courts would reject such an unbending rule. This is true for several reasons. First, real property rights, including those defined by lease, historically have been guarded jealously by Ohio courts. Second, while several Ohio courts have refused to imply an obligation of continuous operation in the circumstances presented to them (see below), in none of those cases did the court take the opportunity to simply reject the notion that such a covenant could ever be enforced. The fact that Ohio courts have more than once addressed the circumstances under which an obligation of continuous operation can or should be implied, supports the conclusion that, where such an obligation is expressly and demonstrably within the contemplation of the parties, it will, at least in some circumstances, be recognized by Ohio courts.

Finally, this Court is of the view, and believes Ohio courts would recognize, that there are some circumstances in which concerns over the need to supervise continuous operation clauses are not substantial concerns and are insufficient to justify the conclusion that a well-informed party's express commitment to perform in a certain way should be disregarded. See, e.g., Massachusetts Mutual Life Insurance Co. v. Associated Dry Goods Corporation, 786 F.Supp. 1403, 1423–25 (N.D.Ind.1992); Dover Shopping Center v. Cushman's Sons, Inc., 63 N.J.Super. 384, 394, 164 A.2d 785, 791 (A.D.1960).

Concluding that Ohio courts would not adopt a per se rule declaring continuous operation clauses unenforceable in all circumstances does not mean, however, that the concerns that have prompted other jurisdictions to adopt such a rule have been or would be ignored in Ohio. Those concerns have been addressed and are manifest in the man-

---

**8.** Hamilton claims these leases are relevant because, (1) they undercut Hills' contention that it would only rarely agree to a continuous operation obligation and (2) they use substantially the same language used in Article XLV and yet proceed to describe the obligation created by such language as an "obligation of continuous operation."

**9.** Hills claims the leases compiled in Defendant's Exhibit 2 are relevant because they show that

Hamilton used very explicit language defining a continuous operation obligation in other leases where it sought to impose such an obligation on lessees. Hills claims the leases compiled in Exhibit I are relevant because they support Mr. Orlando's testimony that Hills only agreed to a continuous operation obligation where that obligation was defined by a term of years (rather than merely the term of the lease).

ner in which Ohio courts resolve requests for enforcement of continuous operation clauses.

 Thus, it is clear from a review of relevant case law in Ohio that lease clauses discussing a tenant's use· of leased premises are to be narrowly construed, with doubts regarding the presence of a continuous operation obligation to be resolved in favor of the lessee. *See Kretch v. Stark,* 26 Ohio Op.2d 385, 393, 193 N.E.2d 307 (Sandusky Cty. 1962).[10] In Ohio, a continuous operation obligation will be found only in those circumstances in which the language of the lease clearly and unambiguously supports the conclusion that the lessee agreed to be bound by such an obligation or where implication of such an obligation is "indispensable to effectuate [the] intention of the parties," (*id.*), and it "appear[s] from the language used that it was so clearly within [the] contemplation of the parties that they deemed it unnecessary to express it." *Id. See also The Warren Plaza Co. v. Giant Eagle, Inc.,* 1990 WL 82537, 1990 Ohio App. Lexis 2381 (Trumbull App.1990) unreported.

 Article XLV does not contain a clearly expressed obligation of continuous operation. Hamilton argues that Hills' promise in Article XLV to use the premises as "a department store or supermarket (and for no other purpose)" and to do so "on all regular business days except legal holidays, at least (8) hours each day between 9:00 a.m. and 10:00 p.m." constitutes a promise to operate in that manner throughout the entire lease term, without interruption. The Court disagrees.

At least one Ohio court has soundly rejected the notion that language in a lease defining or restricting uses to which a leased premises may be put imposes a mandatory

obligation to engage in the allowed uses throughout the lease term. *GMS Management Co., Inc. v. Pick–N–Pay Supermarkets. Inc.,* 77 Ohio App.3d 39, 43–45, 601 N.E.2d 72 (Lake Cty.App.1991). The inclusion of a reference to the days and hours of operation is insufficient to transmute this "use" clause into an express continuous operation clause, moreover. A review of the other leases submitted by Hamilton and Hills during this proceeding supports the conclusion that, where parties seek to impose an obligation of continuing operation on a lessee, precise and unambiguous language is available for that purpose. Absent language referring directly to "continuous operation," an uninterrupted term of use or an agreement to operate during "100%" of the lease term (or some subset thereof), this Court is unwilling to conclude (because it believes Ohio courts would be unwilling to conclude) that an *express* continuous operation obligation exists.[11]

 Consideration of the language of the Lease as a whole and of the circumstances surrounding it also militates against the conclusion that the continuous operation obligation not *expressed* in the Lease should be *implied.* Under Ohio law, "[i]mplied covenants in leases are disfavored at law and are justified only when necessary to effectuate the intention of the parties. ...." *Downtown Associates Ltd. v. Burrows Bros., Co.,* 34 Ohio App.3d 296, 297, 518 N.E.2d 564 (Cuyahoga Cty.1986).

The evidence submitted in this matter does not indicate that the parties intended to include a continuous operation obligation in the Lease: (1) neither Mr. Kline, nor anyone testifying on plaintiff's behalf, was prepared to say that the issue had been discussed during lease negotiations; (2) the letters exchanged between the parties in which the

---

10. Hamilton contends that the Lease should be construed against Hills because a Hills' form lease was the starting point for negotiations. This contention is inconsistent with the language of the Lease itself (Article XLVI), the actual circumstances of the negotiations as disclosed at the evidentiary hearing and with what this Court's understanding of Ohio law on this point.

11. An example of an express continuous operation clause would be one which begins as follows:

Tenant covenants that the premises shall be opened for business, kept opened for business and used by Tenant and any assignee, subtenant or occupant, continuously during the term of this Lease, for the exclusive operation of ... Only language that is virtually this explicit should be deemed sufficient to create an express obligation to operate throughout the lease term.

"basic business terms" of the Lease were set forth do not mention a continuous operation obligation; (3) Mr. Kline's negotiation notes do not refer to a continuous operation clause; (4) Mr. Kline's notes refer to a "use" clause but refer only to the manner, rather than the duration, of "use"; (5) the rent for the premises was calculated by reference to the rent being paid by K–Mart (*See* footnote 7 *infra* ); (6) the base rent for the Leased premises was substantial; and (7) the level of the parties' sophistication with respect to real estate transactions and experience with lease negotiations supports the conclusion that, had these parties intended to agree to a continuous operation obligation, they would have said so explicitly in the Lease.[12]

Under these circumstances, the Court concludes that implication of a covenant of continuous operation is neither consistent with, nor necessary to effectuate, the intent of the parties.

Because reasonable minds could certainly disagree with the Court's conclusions regarding the legal effect of the language in the Lease or the Court's interpretation of the evidence in this case, the Court further finds that the circumstances presented in this case would justify an order requiring specific performance of a continuous operation obligation, if Hills had committed to such an obligation. Specifically, (1) Hills is the sole anchor tenant at the Hamilton West Center, occupying over 45% of the leased space, (2) the obligations of other tenants turn, at least in part, on Hills' presence in the shopping center, (3) Hills is a well-established entity whose concern with its own business reputation would relieve the Court of the need to continuously supervise its operations if ordered to continue and (4) likely damage to Hamilton's real property interests from Hills' decision to vacate the leased premises are not readily quantifiable, making money damages an insufficient remedy.

### Conclusion

For the reasons set forth in this Memorandum, the Court finds that judgment in favor of Hills and against Hamilton on Hamilton's claims in this matter is appropriate. This Memorandum constitutes the Court's findings of fact and conclusions of law under Rule 52(a) of the Federal Rules of Civil Procedure.

IT IS SO ORDERED.

---

**12.** The Court does not rely on testimony regarding the unexpressed intentions of either party. The Court also concludes that the language in Article XLV giving the landlord the right to re-capture the premises if the tenant "elects" to cease operations is irrelevant to the issues resolved in this order.