**METROPOLITAN SPORTS FACILITIES COMMISSION, Respondent,**

v.

**MINNESOTA TWINS PARTNERSHIP, a Minnesota General Partnership, d/b/a Minnesota Twins Baseball Club and the Minnesota Twins, et al., Appellants.**

No. C2–01–2010.

Court of Appeals of Minnesota.

Jan. 22, 2002.

Review Denied Feb. 4, 2002.

Corey J. Ayling, Andrew J. Shea, Richard L. Evans, Kathleen M. Brennan, McGrann Shea Anderson Carnival Straughn Lamb, Chartered, Minneapolis, MN, for respondent.

Roger J. Magnuson, Peter William Carter, Andre Timothy Hanson, Mitchell W. Granberg, Dorsey Whitney LLP, Minneapolis, MN, for appellants.

Mike Hatch, Attorney General, Alan I. Gilbert, Chief Deputy and Solicitor General, Mark B. Levinger, Stuart T. Alger, Assistant Attorneys General, St. Paul, MN, for amicus curiae State of Minnesota.

William M. Hart, Meagher Geer P.L.L.P., Minneapolis, MN, for amicus curiae Charles E. Spevacek.

Considered and decided by TOUSSAINT, Chief Judge, SCHUMACHER, Judge, and KLAPHAKE, Judge.

## OPINION

TOUSSAINT, Chief Judge.

Appellants Minnesota Twins Partnership and Major League Baseball challenge the temporary injunction (1) requiring the Twins to play their 2002 home schedule at the Hubert H. Humphrey Metrodome stadium; (2) enjoining Major League Baseball from interfering with the contract; (3) enjoining the Twins from taking action that would prevent them from playing their 2002 home schedule at the Metrodome; and (4) enjoining the sale of the Twins unless the new owner agrees to comply with the lease terms requiring the Twins to play their 2002 home schedule at the Metrodome. Because the district court did not abuse its discretion in issuing the temporary injunction against the Twins and Major League Baseball to maintain the status quo pending resolution of the merits, we affirm.

## FACTS

The Minnesota Twins (Twins), a privately owned and operated baseball team, are a member of Major League Baseball. Major League Baseball is an unincorporated association of 30 major-league baseball teams. The Metropolitan Sports Facilities Commission (the commission) is a Minnesota governmental entity that was created in 1977 to construct and operate the Hu-

bert H. Humphrey Metrodome in Minneapolis.

The use agreement between the Twins and the commission has been amended over the years and is governed by both legislation and the parties agreements. As originally enacted, the legislation required that the use agreement be no longer than 30 years and no shorter than the term of the bonds used to finance the stadium. Minn.Stat. 473.581, subd. 3(a) (1978). In 1979, the legislature amended the act so that the agreement could provide for termination upon conditions related and limited to the bankruptcy, insolvency, or financial capability of the organization. 1979 Minn. Laws ch. 203, 8.

In October 1997, pursuant to the escape clause in the then-applicable use agreement, the Twins gave written notice terminating the use agreement, effective at the end of the 1998 season. This notice was based on an assertion that the adverse financial conditions necessary to trigger the escape clause existed. The commission brought an action in district court, alleging that the financial conditions had not been met and asserting that the Twins were estopped from relying on those conditions to terminate the contract. The parties then entered into a new use agreement on July 31, 1998, and agreed to dismiss the lawsuit with prejudice.

The 1998 use agreement provided the Twins with a fixed-term agreement for the years 1998–2000, with the option of exercising three one-year extensions following the fixed-term period. In September 2001, the Twins exercised their lease option for the 2002 season.

Under the terms of the agreement, the commission does not charge the Twins any rent for their use of the stadium for home games. Nor do they charge for the Twins year-round use of locker and office space. Rent may be charged only in very limited circumstances, including play of the All-Star game at the Metrodome or post-season play. The Twins also pay a minimal share of utility, upkeep, and maintenance costs. Further, the commission may collect revenue from the sale of concessions, subject to payment of at least 35 of the gross receipts to the Twins. And it receives 25 of the net revenue the Twins collect from advertising at the Metrodome. Together, these sums would amount to an estimated $500,000 for the 2002 season.

Therefore, with no rent being collected, the major benefit that the commission receives under the use agreement is the Twins promise to play baseball at the Metrodome. The Twins are excused from this obligation only if the *force majeure* clause applies and they are unable to play a home game for a reason beyond the Teams and the Commissions control, including strikes, an act of God, a natural casualty, or a court order. If the Twins cease playing games at the Metrodome as required, or if they cease playing major-league professional baseball for any reason, they are in default of the agreement. The remedies available to the commission under the contract include, but are not limited to, injunctive relief and orders for specific performance requiring the Team to play its Home Games at the Stadium during the Term hereof. The agreement is binding on the Twins successors and assigns as well.

The commission became concerned that the Twins would not comply with their one-year agreement after reports that Major League Baseball intended to eliminate or contract two franchises, including the Minnesota Twins. On November 6, 2001, the commission brought a declaratory-judgment action seeking, in relevant part, specific performance of the use agreement and an injunction preventing Major League Baseball from interfering with the

commissions contractual relationship with the Twins. The commission alleged that the Twins sought to circumvent their contractual obligations by selling their franchise to Major League Baseball for $250 million and that the league would then terminate the franchise.

The commission moved for a temporary restraining order on November 6, 2001, and the court issued the ex parte order on the same date. After the commissions motion for a temporary injunction, the district court held a hearing on November 15, 2001. On November 16, 2001, the district court granted the commissions motion for a temporary injunction.

The Twins and Major League Baseball appealed and petitioned the Minnesota Supreme Court for accelerated review. The supreme court denied the motion but ordered this court to consider the appeal on an expedited basis. Accordingly, this court expedited briefing deadlines and the scheduling of oral arguments.

### ISSUE

Did the district court abuse its discretion in temporarily enjoining the Twins from breaching their one-year use agreement with the commission and enjoining Major League Baseball from interfering with the commissions contractual relationship with the Twins?

### ANALYSIS

■ The decision of whether to grant a temporary injunction is within the district courts broad discretion and will not be reversed absent an abuse of that discretion. *Eakman v. Brutger*, 285 N.W.2d 95, 97 (Minn.1979). The district court must make sufficient findings to permit meaningful appellate review. Minn. R. Civ. P. 52.01; *Crowley Co. v. Metro. Airports Commn*, 394 N.W.2d 542, 544–45 (Minn. App.1986) (remanding appeal from denial of injunction for district court to make necessary findings). On review, we consider the facts in the light most favorable to the prevailing party. *Bud Johnson Constr. Co. v. Metro. Transit Commn*, 272 N.W.2d 31, 33 (Minn.1978).

■ Appellants argue that the district court made inadequate findings to support the temporary injunction, especially as to Major League Baseball. When findings are insufficient to permit appellate review, the temporary injunction will be reversed and remanded to the district court for findings. *See Ulland v. Intl. Assn. of Entrepreneurs of Am.*, 527 N.W.2d 133, 135 (Minn.App.1995), *review denied* (Minn. Apr. 18, 1995). This argument, however, cannot be resolved until after we analyze the findings in light of the relevant law. We note that much of the analysis is applicable to both Major League Baseball and the Twins, and that their interests are in many instances intertwined.

■ We now turn to the main issue on appeal, in which we review the injunction for an abuse of discretion. A temporary injunction is an extraordinary equitable remedy. *Miller v. Foley*, 317 N.W.2d 710, 712 (Minn.1982). It is meant to preserve the status quo pending an adjudication on the merits. *Id.* The grant of a temporary injunction neither establishes the law of the case nor constitutes an adjudication of the issues on the merits. *Indep. Sch. Dist. No. 35 v. Engelstad*, 274 Minn. 366, 370, 144 N.W.2d 245, 248 (1966).

■ In evaluating whether the district court abused its discretion, we must consider five factors:

(1)The nature and background of the relationship between the parties preexisting the dispute giving rise to the request for relief.

(2)The harm to be suffered by plaintiff if the temporary restraint is denied as compared to that inflicted on defendant if the injunction issues pending trial.

(3)The likelihood that one party or the other will prevail on the merits when the fact situation is viewed in the light of established precedents fixing the limits of equitable relief.

(4)The aspects of the fact situation, if any, which permit or require consideration of public policy expressed in the statutes, State and Federal.

(5)The administrative burdens involved in judicial supervision and enforcement of the temporary decree.

*Dahlberg Bros. v. Ford Motor Co.,* 272 Minn. 264, 274–75, 137 N.W.2d 314, 321–22 (1965) (footnotes omitted).

### 1. Nature and background of the relationship

■ A temporary injunction is issued to maintain the status quo pending a decision on the merits. *Pickerign v. Pasco Mktg., Inc.,* 303 Minn. 442, 444, 228 N.W.2d 562, 564 (1975). Generally, injunctive relief based on a contract must be coextensive with the terms of the contract. *Cherne Indus., Inc. v. Grounds Assocs.,* 278 N.W.2d 81, 93 (Minn.1979) (citation omitted).

■ The district court found that granting the motion for a temporary injunction would not create a new legal relationship between the parties, [but] would maintain the existing relationship under the Use Agreement. The district court noted that: (1) the Twins exercised their option to play their 2002 home baseball games at the Metrodome; (2) the Twins are scheduled to play 81 games over a six-month period; and (3) the relationship between the Twins and the commission is not a typical landlord-tenant relationship, but instead provides the state, citizens, and fans with substantial non-monetary benefits.

Appellants do not dispute that the Twins and the commission have an existing contractual relationship, which arose when the Twins decided to extend the use agreement for another year. Because the Twins pay no rent for use of the stadium during home games or for their year-round use of locker and office space, the district court may ultimately conclude that their contractual relationship with the commission is not a typical one for landlords and tenants. Instead, the agreement is based on the Twins promise to play their 2002 season at the Metrodome. Additionally, although the relationship between the commission and Major League Baseball is not a contractual one, the Twins are a member of Major League Baseball. Accordingly, the injunction that the district court issued temporarily maintains the status quo by requiring the Twins to play their 2002 home games at the Metrodome and by enjoining Major League Baseball from interfering with the commissions contractual relationship with the Twins. The first Dahlberg factor, therefore, favors the issuance of the temporary injunction.

### 2. Balancing harms

The district court concluded that the commission, the state, citizens, and fans would suffer irreparable harm if the Twins failed to play their 2002 home games at the Metrodome. The court (1) cited the role of baseball as a tradition and as a national pastime, the history of the Twins in Minnesota for some 40 years, including two World Series championships, the role of Twins legends who have bettered the community by their volunteer work with children, and the availability of Twins games as affordable family entertainment; (2) noted that private buildings had been condemned to build the Metrodome; (3)

found that the welfare, recreation, prestige, prosperity, trade, and commerce of the people of the community are at stake; and (4) ruled that the vital public trust outweighs any private interest.

### a. Harm to be suffered by the commission if the temporary injunction is denied

■■■■ The party seeking an injunction must establish that legal remedies are inadequate and that an injunction must issue to prevent great and irreparable injury. *Cherne*, 278 N.W.2d at 92. The lack of a showing of irreparable injury may be a sufficient ground for determining that the district court abused its discretion in granting a temporary injunction. *Morse v. City of Waterville*, 458 N.W.2d 728, 730 (Minn.App.1990) (finding insufficient showing of irreparable harm where injury suffered by plaintiff discharged from employment was primarily economic), *review denied* (Minn. Sept. 28, 1990). Irreparable harm, however, is not always susceptible of precise proof. *Thermorama, Inc. v. Buckwold*, 267 Minn. 551, 552, 125 N.W.2d 844, 845 (1964) (inferring irreparable harm from former employees potential solicitation of customers in violation of contract).

Appellants argue that the district court erred as a matter of law in determining that the commission demonstrated the possibility of irreparable injury. First, they contend that specific performance is not an available remedy for a tenants breach of a commercial lease, and that money damages are adequate. Second, they assert that because the only parties to the lease are the commission and the Twins, the court erred in considering potential harm to the public. We address appellants arguments in turn.

### i. Availability of injunctive relief for breach of the use agreement

■■■ Appellants first claim that a landlord may not obtain specific performance requiring a tenant to stay in business. *See Mayor's Jewelers, Inc. v. State of California Pub. Employees' Ret. Sys.*, 685 So.2d 904 (Fla.Dist.Ct.App.1996). They argue that under the hard and fast rule, specific performance is not available in commercial-lease cases. *See Hamilton W. Dev. Ltd. v. Hills Stores Co.*, 959 F.Supp. 434, 439 (N.D.Ohio 1997) (discussing hard and fast rule adopted by some jurisdictions refusing to order specific performance to enforce obligation of continuous operation in commercial leases, based on burdens to courts of continuing supervision).

Caselaw, however, does not preclude equitable relief as a matter of law in all commercial-lease cases. Even *Mayor's* and *Hamilton* do not stand for the proposition that equitable remedies are always prohibited in commercial-lease disputes. In *Mayor's*, the decision rested on the finding that granting the injunction would have imposed the burden of supervision on the court; the court found it unnecessary to determine whether there was an adequate remedy at law. *Mayor's*, 685 So.2d at 905. In *Hamilton*, where the issue was whether a shopping-center developer could obtain a permanent injunction to prevent a store from ceasing operations in violation of the continuous-operation obligations imposed by lease, the federal court expressed the belief that Ohio courts would *reject* an unbending rule against specific performance in all cases and concluded instead that Ohio state courts would narrowly construe such lease clauses. *Hamilton*, 959 F.Supp. at 439–40.

■■■ Upon examination, the district court may ultimately conclude that the use agreement at issue here is not a typical commercial lease. Under the agreement,

the Twins pay no rent for their use of the Metrodome for the 2002 home games or for their year-round use of locker and office space. Generally, in a commercial lease, the tenant pays the landlord rent as consideration for the use and occupancy of the property. *Mid–City Hotel Assocs. v. Prudential Ins. Co.,* 114 B.R. 634, 641 (Bankr.D.Minn.1990); *Blacks Law Dictionary* 1299 (7th ed.1999). Rent, however, was not the benefit the commission received from the bargain. Instead, the benefit of the bargain that the commission received was the Twins promise to play their home games at the Metrodome for the duration of their lease. Indeed, the stated purpose for building and operating the stadium was to attract major league sports franchises to play at the stadium for the enjoyment of fans. Minn.Stat. 473.556, subd. 12; *see City of New York v. N.Y. Jets Football Club, Inc.,* 90 Misc.2d 311, 394 N.Y.S.2d 799, 803 (Sup.Ct.1977) (noting city did not construct stadium to lease for money consideration but for public purpose of hosting professional sports games).

Next, appellants contend that if the Twins breach the use agreement, the only harm the commission will suffer is lost revenue from concession sales and advertising, in the amount of some $500,000, as well as the loss of the potential for rent from postseason play. *See* Minn.Stat. 473.581, subd. 3(a) (2000) (providing use agreement shall provide for payment of damages in amount of average revenue received by commission in the event team defaults, until replacement team enters into use agreement). They note that under the use agreement, if they play home games elsewhere, they must repay certain concession receipts, signage, revenue, and facilities cost credit received under the agreement. They assert that money damages will compensate the commission for its injuries and that injunctive relief is, therefore, unavailable.

■ The availability of money damages to compensate for some of the harm suffered by a nonbreaching party does not necessarily preclude an injunction; instead, the issuance of injunctive relief depends on whether there are additional injuries for which money cannot compensate the nonbreaching party. *Morse,* 458 N.W.2d at 729–30. Temporary injunctive relief has been upheld when the potential damages are difficult to determine, as in the case when the threatened termination of a dealership would result in an unused plant, the loss or idling of trained employees, and disruption of the dealerships relationship with the buying public. *Dahlberg,* 272 Minn. at 277, 137 N.W.2d at 323. When there is difficulty and uncertainty in determining damages, it may be far better to prevent the injury through a temporary injunction than to attempt to compensate the injured party after the injury has occurred. *Lano Equip., Inc. v. Clark Equip. Co.,* 399 N.W.2d 694, 698 (Minn.App.1987) (citing 5A *Corbin on Contracts* 1142 (1964) (discussing appropriateness of granting temporary injunction despite claim that money damages would be adequate remedy)), *review denied* (Minn. Apr. 17, 1987).

*ii. Propriety of considering harm to the public*

■ The district court ruled that the Commission, the State, citizenry and fans will suffer irreparable harm if the Twins do not play the 2002 baseball games at the Metrodome. Appellants assert that the court erred in considering harm to the public, contending that because the agreement was a commercial lease between landlord and tenant, only harm to the contracting parties may be considered.

The commission was created in 1977 to construct and operate a new sports facility. 1977 Minn. Laws ch. 89. The enabling

legislation explicitly set out public purposes, finding it

> necessary for the public health, safety and general welfare to establish a procedure for the acquisition and betterment of sports facilities and to create a metropolitan sports facilities commission.

Minn.Stat. 473.552 (1978). The commission was authorized to lease the sports facility for purposes that would provide athletic, educational, cultural, commercial or other entertainment, instruction, or activity for the citizens of the metropolitan area. Minn.Stat. 473.556, subd. 12 (1978).

Further, the Metrodome was publicly financed; the legislature authorized the issuance of bonds and the collection of taxes to help fund the Metrodome. Minn. Stat. 473.581, subds. 1(a), 2 (1978). Because the sports facility was used for public, governmental and municipal purposes, it was generally exempted from taxation. Minn.Stat. 473.556, subd. 4 (1978). The supreme court has upheld legislation that was later enacted exempting the Metrodome from property taxation. *Metro. Sports Facilities Commn. v. County of Hennepin*, 478 N.W.2d 487, 488 (Minn. 1991).

The supreme court, in considering a challenge to the use of public funds for construction of the Metrodome, recognized that construction of a stadium for use by professional sports teams constitutes a public purpose for which public expenditures may legally be undertaken. *Lifteau v. Metro. Sports Facilities Commn*, 270 N.W.2d 749, 751–52 (Minn.1978). The court took judicial notice of the importance of professional sports in citizens social lives, the entertainment and recreational purposes the stadium would serve, the jobs the stadium would provide, and the anticipated benefits to neighboring businesses. *Id.* at 754–55.

The public interest in Major League Baseball franchises in general has been recognized by others. In discussing possible effects of the potential loss of baseballs antitrust exemption, Chairman Selig stated that it

> could irreparably injure [fans] by leading to the removal of live professional baseball from communities that have hosted major league and minor league teams for decades.

*Hearing Before the Subcomm. on Econ. and Commercial Law of the House Comm. on the Judiciary*, 103d Cong. 49 (1993) (statement of Allan H. Bud Selig, Chairman, Executive Council of Major League Baseball and President, Milwaukee Brewers Baseball Club). Similarly, based on his own unsuccessful efforts to stop the relocation of the Milwaukee Braves, Selig told Congress that he believed that the professional sports league and Major League Baseball should vigilantly enforce strong policies prohibiting clubs from abandoning local communities which have supported them. *Baseballs Antitrust Immunity: Hearing Before the Subcomm. on Anti–Trust, Monopolies and Business Rights of the Senate Comm. on the Judiciary*, 102d Cong. 110 (1992) (statement of Allan H. Selig, Owner, Milwaukee Brewers Baseball Club). He further stated that franchise relocation should be prohibited except in the most dire circumstances where the local community has, over a sustained period, demonstrated that it cannot or will not support the franchise. *Id.* at 110–11.

In addition, legal commentators have recognized that money damages are not sufficient to compensate for the harm suffered by a community for the loss of a professional sports team. *See, e.g.,* Matthew J. Mitten Bruce W. Burton, *Professional Sports Franchise Relocations From Private Law Public Law Perspectives:*

*Balancing Marketplace Competition, League Autonomy, and the Need for Level Playing Field,* 56 Maryland L.Rev. 57, 70–71 (1997). According to these commentators,

> [m]erely allowing a city to recover contract damages for the premature loss of a team does not provide adequate compensation for the citys lost benefit of the bargain in providing the public, financial inducements necessary to attract or retain a sports franchise. * * * The citys real benefits of the bargain are the highly valued, intangible benefits * * *. The value of such benefits is virtually impossible to quantify and, therefore, is not recoverable for a team owners breach of contract.

*Id.*

Money damages may compensate a developer or manufacturer but money cannot compensate the people * * * for immeasurable, indirect and intangible damages. *N.Y. Jets,* 394 N.Y.S.2d at 803. Since it appears from the record that money could not compensate the commission for the intangible losses that would result if the Twins breached their promise to play, the district court did not abuse its discretion in considering harm to the public when deciding whether to grant temporary injunctive relief.

### b. Harm to be suffered by appellants if injunction is granted

■ The district court found that the public interest outweighs any private interests, but otherwise made no specific findings on the potential harm that appellants claim. The Twins contend that the harm they will suffer if forced to stay in business is financial. They (1) cite the commissions admission on its website that the Metrodome is unsuitable for professional baseball and its reference to the Twins inability to generate sufficient stadium revenues; (2) rely on material in the commissions appendix referring to losses the Twins have suffered; and (3) assert that when interest payments are considered, the Twins lost almost $4 million last season.

Major League Baseball asserts that it will also suffer substantial harm because the injunction will cause it to incur the cost of sending teams to Minnesota and to lose control over baseball. It characterizes the injunction as a sweeping order that mandates the major league teams from the United States and Canada to send teams to Minnesota to play a season of baseball for the benefit of the commission.

The commission disputes the Twins claim that they are being forced to lose money, noting that they have already played 41 seasons and contractually obligated themselves to play one more season only a few months ago, when they exercised their option under the use agreement. Furthermore, the Twins submitted no financial records to the district court in support of their claim that they will lose money if forced to play the 2002 season.

The commission also contends that the irreparable harm attributable to contraction and the leagues voluntary decision to approve its members contracts and do business in Minnesota justifies an injunction with an impact outside Minnesota. The commission notes that Major League Baseball has not contested personal jurisdiction in the district court and argues that it voluntarily availed itself of the forum offered by Minnesota courts. This court has previously upheld a temporary injunction affecting business and litigation outside Minnesota. *Medtronic, Inc. v. Advanced Bionics Corp.,* 630 N.W.2d 438, 456–57 (Minn.App.2001) (upholding injunction ordering California competitor to comply with Minnesota noncompete agreement).

The district court must base its decision on affidavits, deposition testimony or oral testimony in court. Minn. R. Civ. P. 65.02(b). The material on which appellants rely to support their claim that they will lose money if the injunction issues was not presented to the district court in this form. On the record before this court, viewed most favorably to the prevailing party, we conclude that the district court did not abuse its discretion in concluding that the possibility of irreparable harm to the commission and the public outweighed the potential harm shown by the Twins and Major League Baseball.

### 3. Likelihood that commission will prevail on the merits

■ If a plaintiff can show no likelihood of prevailing on the merits, the district court errs as a matter of law in granting a temporary injunction. *Sanborn Mfg. Co. v. Currie*, 500 N.W.2d 161, 165 (Minn.App.1993). But if a plaintiff makes even a doubtful showing as to the likelihood of prevailing on the merits, a district court may consider issuing a temporary injunction to preserve the status quo until trial on the merits. *Dahlberg*, 272 Minn. at 275 n. 13, 137 N.W.2d at 321 n. 13 (upholding temporary injunction despite finding that plaintiff may have serious obstacles to overcome before establishing its right to what in effect amounts to specific performance of the franchise agreement).

The district court found that there was a substantial likelihood that the commission would prevail on the merits because (1) the Twins exercised their option to lease the Metrodome for the 2002 baseball season, obligating themselves to play 2002 home games at the Metrodome; (2) the schedule has been published and the Twins are selling season tickets for the games; (3) for contraction of the Twins to occur, the owner must voluntarily agree to sell the team; and (4) elimination of the Twins franchise would result in a breach of the use agreement. Citing the use agreement, the court determined that the commission was entitled to specific performance requiring the Twins to play its home games at [the Metrodome]. The court found that monetary relief would not be adequate to compensate the commission for the breach, citing the public interest and the intent that citizens would benefit in substantial nonmonetary ways from the use agreement, as reflected in the agreement that the Twins will not be required to pay ordinary rent.

### a. Whether the use agreement explicitly authorizes specific performance as a remedy for breach

■ The Twins first challenge the district courts determination that the use agreement entitles the commission to specific performance requiring the Twins to play [their] home games at the [Metrodome]. The section at issue provides:

18.3 If the Team ceases to play its games at the Stadium as required by section 2.3 for any reason other than the reasons in section 15 [the *force majeure* clause] or if the Team ceases to play major league professional baseball games for any reason, the Team shall have breached this agreement and *will be liable for such remedies as may be available to the commission at law or in equity, including, but not limited to injunctive relief and orders for specific performance requiring the Team to play its Home Games at the Stadium during the Term hereof.*

(Emphasis added.) We agree with the parties that the plain language of the use agreement authorizes any remedy allowed by law or equity, including but not limited to injunctive relief and specific performance in the event of a breach.

*b. Whether the commission has established a substantial likelihood of success on the merits*

■■■ In its complaint, the commission sought a declaratory judgment that elimination of the Twins franchise by contraction and the Twins acceptance of consideration for such action would violate the 1998 use agreement. The commission sought permanent injunctive relief to prevent the Twins from violating the terms of the 1998 use agreement.

■■■ The declaratory-judgment act allows a party to seek a determination as to the construction of a contract and to obtain a declaration of rights, status, or other legal relations under the contract before a breach occurs. Minn.Stat. 555.02, .03 (2000). The policy behind the declaratory judgment act is to allow parties to determine certain rights and liabilities pertaining to an actual controversy before it leads to repudiation of obligations, invasion of rights, and the commission of wrongs. *Culligan Soft Water Serv. v. Culligan Intl. Co.*, 288 N.W.2d 213, 215–16 (Minn.1979).

Appellants argue that specific performance is not available to enforce a commercial lease. *See Stronge Warner Co. v. H. Choate Co.*, 149 Minn. 30, 34–35, 182 N.W. 712, 713–14 (1921) (holding that specific performance of lease terminated by the landlord was unwarranted where third party was already established in the leased premises, and parties relationship required parties to operate in mutual and cooperative manner, such that compelling them to continue after the open rupture would be embarrassing and financially detrimental to both). They acknowledge that a few courts have authorized injunctions ordering stores to remain open pursuant to continuous operation provisions in leases, but assert that the decisions denying injunctive relief reflect the modern trend and majority rule. *8600 Assocs., Ltd. v.*

*Wearguard Corp.*, 737 F.Supp. 44, 46 (E.D.Mich.1990). They point out that even when one federal district court issued a temporary injunction requiring an anchor store in a mall to specifically perform under a lease, it required the mall owner to post a $1 million bond, and the injunction was then stayed pending disposition of the appeal. *Mass. Mut. Life Ins. Co. v. Associated Dry Goods Corp.*, 1992 WL 100397 (7th Cir.1992) (staying injunction pending appeal); *Mass. Mut. Life Ins. Co. v. Associated Dry Goods Corp.*, 786 F.Supp. 1403, 1431 (N.D.Ind.1992) (ordering injunction and bond).

We are considering a use agreement, which may not be a typical commercial lease between a landlord and tenant. Further, the contract between the commission and the Twins does not foreclose specific performance as a remedy, but instead actually identifies it as a potential remedy, if otherwise warranted under law and equity.

■■■ A party does not have an automatic right to specific performance as a remedy for breach of a contract. *Dakota County HRA v. Blackwell*, 602 N.W.2d 243, 244 (Minn.1999). Instead, the district court must balance the equities of the case and determine whether the equitable remedy of specific performance is appropriate. *Id.* The supreme court has ordered specific performance in contractual settings in which damages were not readily measurable. *See, e.g., Blankenfeld v. Smith*, 290 Minn. 475, 479, 188 N.W.2d 872, 874 (1971) (upholding order for specific performance requiring sale of corporate stock).

Thus, considering the caselaw, the equities, the unique aspects of this case, and the recognition in the contract that specific performance may be a remedy, the district court did not abuse its discretion in concluding that the commission may prevail on the merits.

Appellants next contend that, although the commission is no more than a commercial landlord, the district court found that the Minnesota Twins owe a duty to perform that, in effect, creates a personal-services contract. According to appellants, such agreements are not subject to specific performance. *See, e.g., Minneapolis Mill Co. v. Bassett,* 31 Minn. 390, 392, 18 N.W. 100, 100 (1884) (specific performance unavailable for breach of personal-services contract because usually there is an ample remedy in damages, and [because] enforcement of the decree would involve the court in superintendence of the work, a duty which courts are loath to assume). While personal-services contracts generally are not enforceable, they may be enforceable under genuinely extraordinary circumstances. *See Miller,* 317 N.W.2d at 713 (holding, however, that employees were not entitled to temporary injunction preventing employment termination because injuries they sustained were common to most discharged employees). In any event, as we have discussed above, this is a use agreement and we decline to adopt appellants argument.

The next question is whether the commission is likely to prevail on the merits on its tortious-interference-with-contract claim against Major League Baseball. Tortious interference with a contract requires a showing of (1) a contract; (2) the alleged tortfeasors knowledge of a contract; and (3) his or her intentional procurement of a breach; (4) without justification; (5) resulting in damages. *Bouten v. Richard Miller Homes, Inc.,* 321 N.W.2d 895, 900 (Minn.1982).

Major League Baseball contends that an award of damages under the contract is the only remedy and that injunctive relief is unavailable as a matter of law. *See Swaney v. Crawley,* 133 Minn. 57, 60, 157 N.W. 910, 911 (1916). Further, it contends that no remedy is available where no breach has yet occurred. But the Minnesota Supreme Court has explicitly stated that once a party to a contract has established that this tort applies, the courts may hold that third party liable for resulting damages as well as grant necessary injunctive relief. *Kallok v. Medtronic, Inc.,* 573 N.W.2d 356, 361 (Minn.1998).

Finally, Major League Baseball contends that the district court injunction impermissibly regulates interstate commerce in violation of the Commerce Clause. A reviewing court must generally consider only those issues that the record shows were presented and considered by the trial court in deciding the matter before it. *Thiele v. Stich,* 425 N.W.2d 580, 582 (Minn.1988) (quotation omitted). Likewise, an appellant generally may not raise a constitutional issue for the first time on appeal. *In re Welfare of C.L.L.,* 310 N.W.2d 555, 557 (Minn.1981).

Major League Baseball argued to the district court in a supplemental memorandum that application of the law governing franchises in Minnesota, Minn.Stat. ch. 80C (2000), would violate the limits placed on state authority by the Commerce Clause of the United States Constitution. On appeal, they make the much broader argument that issuance of the injunction violates the Commerce Clause. Because Major League Baseball did not raise this broad issue below, and the district court did not consider it independently, we decline to address it.

### 4. Consideration of public policy

The district court found that a temporary injunction would further public policy because local professional sports franchises are an important community asset and should fulfill their contractual obligations. Appellants contend that the pub-

lic policy implicated is one that permits private businesses to manage their own affairs and that there is no corresponding public policy favoring a government mandate for continued operation of a private enterprise. But the Twins entered into the agreement to use the Metrodome, which was publicly built, financed, and operated for the benefit of the public. *See* Minn.Stat. 473.552 (2000); *Lifteau,* 270 N.W.2d at 754–55. Consequently, this factor weighs in favor of granting the injunction.

### 5. Administrative burdens involved in judicial supervision and enforcement of temporary injunction

 The district court determined that its decision would impose minimal administrative burdens. Appellants contend, however, that Minnesota courts have shown significant hesitance to take over management of a business under an injunction, because of requirements that involved parties maintain a cooperative relationship. *See Pac. Equip. & Irrigation, Inc. v. Toro,* 519 N.W.2d 911, 916 (Minn.App.1994), *review denied* (Minn. Sept. 16, 1994). Certainly, ordering the parties to maintain a cooperative relationship may impose a continuing duty of supervision on the district court. *Id.* And courts look with disfavor on specific performance of leases because of the burden of continuing judicial supervision that may be required. *Hamilton,* 959 F.Supp. at 439.

The commission acknowledges that if the franchise had already left town, fashioning an injunction would require a massive restructuring of the status quo that could entail administrative and supervisory costs significant enough to dissuade a court from issuing a temporary injunction. But here, the status quo is preserved by the injunction, which merely continues a close, long-term relationship. *See Lano,* 399 N.W.2d at 700 (affirming a temporary injunction requiring continuation of dealer

contract in context of 26–year dealership relationship, where district court expressed willingness to address administrative problems). The district court here determined that granting the temporary injunction would not impose significant administrative burdens, and the existing record supports that finding.

### Motion for judicial notice

 Finally, we address the commissions request that this court take judicial notice of supplemental facts contained in its appendix. The record on appeal comprises the papers filed in the trial court, the exhibits, and the transcript of the proceedings, if any. Minn. R. Civ.App. P. 110.01. Except in cases involving uncontroverted documentary evidence that would support an affirmance, an appellate court may not base its decision on matters outside the record on appeal and may not consider matters not received in evidence. *In re Real Property Taxes for 1980 Assessment,* 335 N.W.2d 717, 718 n. 3 (Minn. 1983). Because many, if not most, of the supplemental facts that the commission asks us to notice judicially are either disputed or controversial or were not presented to the district court in the first instance, we decline to consider them.

### Conclusion

We are faced with a very limited standard of review and may reverse the order granting a temporary injunction only if we conclude, after reviewing the order in light of the Dahlberg factors, that the district court abused its discretion. We are not reviewing a final decision on the merits; the temporary injunction is intended to maintain the status quo pending trial.

The district courts findings are sufficient to allow us to conduct meaningful review of the temporary injunction. Based on the irreparable harm that will result if the commission does not receive the benefit of its bargain—which will occur if the Twins

breach their promise to play their 2002 home games at the Metrodome—as well as the interests in maintaining the status quo pending resolution on the merits, the possibility of success on the merits, the public policy concerns, and the minimal administrative burdens on the district court, we hold that appellants failed to show that the district court abused its discretion in issuing the temporary injunction.

## DECISION

The district court did not abuse its discretion in issuing a temporary injunction in favor of the Metropolitan Sports Facilities Commission pending trial on the merits.

**Affirmed.**